**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

NEW MEXICO FORWARD PARTY; BOB PERLS; MICHAEL VIGIL; DENNIS DINGE; HARRY MONTOYA; AND FRANCES KAVA,

Plaintiffs,

v. Civ. No. 1:26-cv-02286-MIS-SCY

MAGGIE TOULOUSE OLIVER, in her official Capacity as Secretary of State of New Mexico; and BARBARA DELANEY, in her official capacity as County Clerk of Luna County, New Mexico,

Defendants.

**THE SECRETARY OF STATE'S RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENT MOTION FOR PRELIMINARY INJUNCTION**

Defendant Maggie Toulouse Oliver, as Secretary of State of New Mexico (the Secretary), respectfully submits this response opposing plaintiffs' motion, which asks the Court to preliminarily enjoin parts of New Mexico's Election Code that apply to minor political parties. For the reasons that follow, plaintiffs' arguments do not justify a preliminary injunction, and the motion should be denied.

## INTRODUCTION

Article I, Section 4 of the United States Constitution imparts on every state the power to regulate elections. New Mexico has done so through its Election Code, N.M. Stat. Ann. §§ 1-1-1 to 1-26-6, and the Secretary is responsible for implementing those laws. N.M. State. Ann. § 1-2-2 (2011). Like many states, New Mexico has chosen to statutorily sort political parties into two categories: major political parties and minor political parties. The difference is in the percentage support the party can garner in comparison to the total votes for governor or president in the

previous general election. *See* N.M. Stat. Ann. § 1-7-7 (2011). Once qualified, each party then has additional steps they must take to have their candidates listed on the ballot. For minor political parties, the candidates must be nominated by their party and then obtain signatures from a certain percentage of registered voters to qualify to appear on the ballot. N.M. Stat. Ann. § 1-8-2(B) (2011).

Distinguishing between major political parties and minor political parties is not unique to New Mexico. Many states employ a similar framework, and do so to ensure that candidates appearing on a ballot have some modicum of support. Declaration of Mandy Vigil, August 14, 2026, attached as **Exhibit A**, ¶¶ 10–11. This framework has been tested for decades in litigation and has been upheld by the United States Supreme Court, Tenth Circuit, the New Mexico Supreme Court, and this Court, all of which accept that, on balance, the state's interest in conducting an orderly election outweighs the minimal burdens imposed on candidates to collect signatures to appear on the ballot.

Plaintiffs are five candidates of a newly formed political party and the party itself, the New Mexico Forward Party (NMFP), all of whom seek to enjoin parts of New Mexico's election framework that require petition signatures for minor political party candidates and the party. N.M. Stat. Ann. §§ 1-8-2(B) and 1-8-2(E). Even though three out of the party's five candidates were successful in their efforts to appear on this November's ballot for the general election,[1] they all complain that New Mexico's requirement to obtain signatures separately from their party is a

[1] Plaintiffs concede that Dennis Dinge and Harry Montoya qualified for the ballot. Doc. 8 at 8. Since filing the complaint, plaintiff Frances Kava has also been qualified by the Luna County Clerk for the ballot, consistent with the Secretary's decision to qualify Montoya. Vigil Decl., ¶ 19. Similarly, plaintiff New Mexico Forward Party succeeded in qualifying as a minor political party. Dinge, Montoya, Kava, and the NMFP have not been harmed by the laws they challenge, so it is unclear how they have Article III standing to sue. *See Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023) (political organization lacked standing to assert First Amendment claim concerning a disclaimer in electioneering materials "because there is no evidence suggesting the disclaimer requirement ever affected Appellants' speech or conceivably would affect their speech.").

"severe burden" that "freezes the political status quo." Mot. for Prelim. Inj., Doc. 8, at 9, 12. However, to the contrary, New Mexico's statutory framework reflects a careful balance between ballot access and avoiding a demonstrated history of overcrowding and frivolous candidates on the ballot. And this framework has, both historically and recently, permitted minor parties to appear on the ballot (including plaintiffs themselves), even resulting in minor political parties becoming major political parties under the Election Code. Vigil Decl., ¶ 12.

Plaintiffs' misapprehensions about the difficulties minor parties face getting on the ballot are not all that counsel against accepting their challenge. The requirement that minor party candidates obtain additional signatures beyond the party itself, a two-step framework, has already been scrutinized and upheld. This Court previously accepted that New Mexico's interest in ensuring candidates have a modicum of support—in addition to their party—is sufficient to outweigh the burden on candidates to petition for signatures separately. *See Libertarian Party of N.M. v. Vigil-Giron*, CIV-06-0615 MV/ACT, 2006 WL 8443845, at *11 (D.N.M. Sept. 18, 2006) (affirmed in *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303 (10th Cir. 2007)). The Third Circuit Court of Appeals has also evaluated the same challenge plaintiffs make here against a similar two-step framework in Pennsylvania and upheld the law. *Rogers v. Corbett*, 468 F.3d 188 (3d Cir. 2006). And the Supreme Court has recognized significant petition requirements much harsher than New Mexico's are not unduly burdensome—even candidates needing to obtain 325,000 signatures in 24 days was not "impractical." *Storer v. Brown*, 514 U.S. 724, 740 (1974). In contrast, the two plaintiffs here who did not qualify for the ballot, Bob Perls and Michael Vigil, had 41 days to obtain 14,200 signatures each. If NMFP had not waited until after the primaries to qualify as a party, its candidates would have had up to 115 days. *See* Vigil Decl., ¶ 8.

When the facts and case law are considered, it becomes apparent that New Mexico's interest in having candidates show a level of support to prevent overcrowded ballots of frivolous candidates outweighs the burden on these plaintiffs to obtain a relatively modest number of signatures. These plaintiffs are unlikely to succeed on the merits of their constitutional challenge and should not be granted a preliminary injunction. Doing so would permit them to avoid the petition requirement, making these plaintiffs unlike any other candidate on New Mexico's ballot. The remedy sought by plaintiffs would undermine the policy decisions New Mexico's Legislature has made in crafting the Election Code and put the Court in the position of deciding who is on the ballot. The motion should be denied.

**ARGUMENT**

The Secretary agrees with plaintiffs that to be entitled to a preliminary injunction they must show (1) a substantial likelihood of success on the merits, (2) the threat of irreparable injury, (3) that threat outweighs New Mexico's interests, and (4) the injunction would not be adverse to the public interest. *See Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016). The Secretary disagrees that plaintiffs can meet each of those elements. Moreover, plaintiffs in this case have a heightened burden because the injunction they seek is disfavored.

Disfavored injunctions are those that alter the status quo, mandate action, or afford all relief the movant would seek at trial. *See id.*; *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). Here, plaintiffs' requested injunction would alter the status quo by changing the law applicable to all minor party candidates in New Mexico to permit them to avoid their signature petition obligations, it would mandate the Secretary accept ballots with the two plaintiffs who did not qualify under the law, and it would award the ultimate relief plaintiffs desire—to appear on the general election ballot in November. *See* Doc. 8 at 22 (requesting relief). Plaintiffs' injunction is

disfavored on all fronts, and so it must be "closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Schrier*, 427 F.3d at 1261 (internal citation omitted). Plaintiffs certainly cannot meet that higher burden.

## I
## PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

Plaintiffs assert that New Mexico's Election Code as applied to them unduly burdens their First Amendment rights related to ballot access and political speech, and violates the Fourteenth Amendment's equal protection clause by treating them differently than major party candidates. *See* Doc. 8 at 9. This is so, according to plaintiffs, because the two-step framework to qualify as a minor party candidate—first requiring a political organization to qualify as a party, then for an individual candidate to petition for signatures to get on the ballot—imposes too high of a burden and is unlike any other state's requirements. *Id.* at 10–14; N.M. Stat. Ann. § 1-7-2(A) (2011); N.M. Stat. Ann. § 1-8-2. Plaintiffs also attack N.M. Stat. Ann. § 1-8-65 (2014), which requires minor party candidates to collect signatures on a petition form that becomes available in March of even-numbered years. They argue this is impermissible viewpoint discrimination instead of a reasonable time, place, and manner regulation on petitioning. Doc. 8 at 16.

For any political party to be recognized under New Mexico law it must obtain signatures "of at least one-half of one percent of the total votes cast for the office of governor at the preceding general election" from registered voters expressing a desire to have the party qualify. N.M. Stat. Ann. § 1-7-2(A). This can happen "at any time," whether there is an upcoming election or not. *Id.* Then in advance of an election, the Secretary promulgates petition forms for individual candidates to solicit signatures from voters wanting the candidate to qualify for the ballot. This occurs in October of odd number years for major parties, and March of even number years for minor parties. N.M. Stat. Ann. §§ 1-8-2(B), 1-8-33(B). Courts have already reviewed challenges to this two-step

framework, and others like it, and found arguments against its constitutionality wanting. Plaintiffs cannot show that this framework—which is not unique across the country—is likely to be found unconstitutional; plaintiffs' arguments to the contrary rely on court opinions that do not apply here and facts leading to their alleged "severe burden" that are self-imposed or slight in comparison to other states.

**A. Plaintiffs' Claims are Subject to Close Scrutiny as Facial Challenges**

On the surface, plaintiffs say that their challenge is only as the Election Code applies to them; a closer look at the arguments, however, shows they mount a facial challenge. "A facial challenge is a head-on attack [of a] legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (alteration in original). Here, even though only two of their candidates failed to qualify, and those two candidates only needed to obtain 14,200 signatures each, plaintiffs largely attack the Election Code by claiming that NMFP is required to "submit 10 separate petitions with 131,361 signatures." Doc. 8 at 5. This is only so if NMFP had candidates for every statewide-elected office—not the two offices plaintiffs failed to qualify for. Moreover, plaintiffs contend that the two-step signature framework impermissibly burdens every minor party and minor party candidate, regardless of any circumstance unique to the NMFP or its nominees. If the framework is unconstitutional simply because plaintiffs are minor party candidates (as they assert), there is no remaining constitutional application of the statutes (which only affect minor parties). The same goes for plaintiffs' argument that the window for gathering signatures is unconstitutional, because none of these plaintiffs sought to gather signatures before the petition was available under N.M. Stat. Ann. § 1-8-65. The earliest any plaintiff allegedly began gathering signatures was in May, *see* Doc. 8 at 4, but the petition was available on March 2, 2026. Vigil Decl., ¶ 16.

Plaintiffs' arguments for "[i]nvalidating the statutes for recognized minor parties would strip the statutes of each and every application they have." *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015). "By challenging the statutes as applied to recognized minor parties, the plaintiffs have in effect asserted a facial challenge." *See id.* (applying a heightened facial challenge standard to claims that election statutes "imposed a severe burden" on minor political parties). Because plaintiffs' challenge is to facial validity, they have the heightened burden of showing that no application of the statutes is constitutional. If despite their own arguments plaintiffs insist that their challenge is truly as applied, they must "concede[] that the statute may be constitutional in many of its applications," and this Court should make no holding about the framework in other applications. *See Carel*, 668 F.3d at 1217.

**B. New Mexico's Two-Step Qualification Framework is Constitutional**

As an initial matter, New Mexico's statutes requiring a party and its candidates to petition for signatures are not automatically subjected to strict scrutiny, as plaintiffs suggest. *See* Doc. 8 at 9–10. The Tenth Circuit has recognized that, in ballot cases, the analysis does not consistently demand "a compelling state interest nor . . . that the state demonstrate it has achieved this end by the least restrictive means available." *See Rainbow Coal. v. Okla. State Election Bd.*, 844 F.2d 740, 743 (10th Cir. 1988). This is because, as the Supreme Court has held, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Such regulations may justifiably include limits on "the field of candidates from which voters might choose," and that alone "does not of itself compel close scrutiny." *Bullock v. Carter*, 405 U.S. 134, 143 (1972). Differences between how major and minor political parties are regulated, for example, "are not *per se* unconstitutional." *Rogers*, 468 F.3d at 196.

The Court must instead engage in a balancing between the severity of the burden on ballot access against New Mexico's "justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see also Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007). When the regulation on ballot access imposes "reasonable, nondiscriminatory restrictions," then "the State's important regulatory interest are generally sufficient to justify" the regulation. *Anderson*, 460 U.S. at 788.

**1. The Burden on Plaintiffs is not Severe**

The burden claimed by plaintiffs amounts to a complaint about the number of signatures minor party candidates must obtain—that major parties are treated more favorably, no other state has similarly high requirements, and that the requirements operate to "freeze" the status quo on political parties. *See* Doc. 8 at 10–13. Section 1-8-2 requires minor political party candidates to obtain a different number of signatures depending on the position sought and size of the party, ranging from 1% or 2% of the number of votes for governor in the previous election. *See* N.M. Stat. Ann. 1-8-51 (2023). Even taking as true plaintiffs' assertion that their two candidates who failed to qualify had 41 days to obtain 14,200 signatures from any voter,[2] *see* Doc. 8 at 8, compared to signature requirements analyzed by other courts, this is not a significant burden.

In *Jenness v. Fortson*, 403 U.S. 431, 438 (1971), the Supreme Court addressed a Georgia law requiring candidates who failed to enter or win a party primary to obtain signatures from 5% of voters eligible to vote in the previous election. Voters could sign multiple petitions, made no

[2] The number of days plaintiffs had to collect signatures was a result of NMFP's late certification in New Mexico. The party could have formed at any time, see § 1-7-2, but chose an election year to do so. Even then, the party announced its organization on April 10, 2026, yet waited until May 8, 2026, to actually submit its filings to qualify as a political party. See Doc. 8 at 4; Joshua Bowling, Former presidential candidate Andrew Yang launches NM Forward Party, Source NM (April 10, 2026), https://sourcenm.com/briefs/former-presidential-candidate-andrew-yang-launches-nm-forward-party/. These delays truncated the available time for NMFP candidates to obtain signatures. Had NMFP formed earlier, it could have obtained petitions as early as March 2, 2026, and had 115 days to collect signatures.

commitment to vote for the candidate, and did not need to be a member of the candidate's party. *Id.* at 439. This scheme imposed "no suffocating restrictions" and the Court found nothing about it abridged "the rights of free speech and associated secured by the First and Fourteenth Amendments." *Id.* Similarly, in *American Party of Texas v. White*, 415 U.S. 767 (1974), the Court considered a Texas law requiring candidates of minor political parties to demonstrate support from at least 1% of the total vote for governor in the previous election. This amounted to approximately 22,000 signatures in 55 days, which the court found was not "impossible or impracticable" to obtain. *Id.* at 783. Higher still, the Supreme Court has held that even a law mandating 325,000 signatures in 24 days in California "would not appear to be an impossible burden." *Storer*, 415 U.S. at 740. The lesson from these cases is obvious: "The constitutionality of statutes requiring nominating petitions, or their functional equivalent, which contain a number of signatures equal to a percentage of total voters is beyond question." *Dillon v. Evans*, 549 F.2d 183, 184 (10th Cir. 1977).

The burden New Mexico's Election Code places on plaintiffs here is slight in comparison. The three candidates who qualified for the ballot, Dennis Dinge, Harry Montoya, and Frances Kava, did so with 1,014, 928, and 118 signatures respectively. Doc. 8 at 8–9. The two who failed to qualify, Bob Perls and Michael Vigil, needed only 14,200 signatures each. Doc. 8 at 5. This is significantly fewer signatures than those required by other states and upheld by the Supreme Court. The 5% of *eligible* voters in *Jenness* is far more than the 1% or 2% of *votes cast* New Mexico requires. 403 U.S. at 433. New Mexico also made the minor party candidate petition available on March 2, 2026. Vigil Decl., ¶ 16. This provided candidates with 115 days to collect 14,200 signatures by June 25—from any voter, regardless of party. *See* N.M. Stat. Ann. § 1-8-2(B) (requiring petitions to be filed within 23 days of the June 2 primary). That amounts to about 123

signatures per day. This is a far cry from the 1,466 signatures per day found acceptable in *American Party* or the 13,542 signatures per day in *Storer*. The burden is even less as a practical matter, because the candidates in those cases ran in the 1970s, when they had no option but to physically canvas voters. *See Storer*, 415 U.S. at 740 ("1,000 canvassers could [collect sufficient signatures] if each gather 14 signers per day."). Here, plaintiffs by their own admission took advantage of digital communications to send "nearly 1.166 million text messages" to "more than 500,000 registered voters." Doc. 8 at 8. If far more signatures were required of candidates with far less sophisticated tools, plaintiffs suffer practically no burden at all collecting the required signatures here.[3] "[A] minor party is not impermissibly burdened by ballot access restrictions when 'a reasonably diligent independent candidate' could be expected to satisfy the ballot access requirement." *Vigil-Giron*, 2006 WL 8443845, at *8 n.6 (quoting *Storer*, 415 U.S. at 742).

Nor are plaintiffs burdened by New Mexico's two-step framework, requiring the political party to qualify and then the individual candidate to obtain signatures. The Third Circuit Court of Appeals already addressed this framework when rejecting a challenge to Pennsylvania's election laws, which has the same two-step system as New Mexico. In *Rogers v. Corbett*, the Court recognized that the two-step system serves a useful purpose: to show the candidate has a "modicum of support" separate from the party, which voters may have different reasons for supporting. 468 F.3d at 197 ("Permitting the 'modicum' to be perpetual" based only on party qualification "may result in ballot clutter."). The two-step system for minor parties in Pennsylvania, as in New

[3] Bob Perls and Michael Vigil assert in their declarations that these communications were not fruitful because the Secretary's online petition platform was not functional "until June 12." Doc. 8-2, ¶ 9; Doc.8-3, ¶ 16. This is not apparent from the emails Perls attaches, which appear as scrambled text. More importantly, the Secretary's online platform was functional from March 18 onward. Vigil Decl., ¶ 16. Plaintiffs were unable to utilize the platform, however, because they were not yet registered with NMFP. *Id.* ¶ 17. This was due to plaintiffs attempting to change their voter registration during a statutory pause in registration processing between May 5 and June 8. *Id.* Plaintiffs were informed of this, and had NMFP formed earlier, plaintiffs could have fully utilized the online platform. *Id.* Regardless, the point stands plaintiffs were free to obtain signatures through other means because the petition was available on March 2, and were encouraged to do so. *Id.* ¶ 18.

Mexico, was found to be consistent with requirements imposed on major political parties. *Id.* at 196. Like minor parties, major parties not only must be qualified, they must then nominate candidates, and then those candidates must obtain signatures from party members and then ultimately face a vote in their party's primary. *See id.* This is like major party candidates in New Mexico. N.M. Stat. Ann. § 1-8-33(B) (2023) ("Candidates who seek preprimary convention designation shall file nominating petitions . . . signed by a number of voters equal to at least 2% of the total vote of the candidate's party . . . ."). The fact major and minor parties in Pennsylvania had similar requirements undermined the *Rogers* plaintiffs' assertion of a severe burden on ballot access. *Rogers*, 468 F.3d at 197. That Pennsylvania and New Mexico have this two-step framework[4] while other states may not, an argument the *Rogers* plaintiffs and the plaintiffs here both make, "does not inflate the burden on the plaintiffs," and makes no difference given "analogous obligations to demonstrate continuing voter support in the retention requirements found in other states." *Id.* (collecting cases). All in all, the Third Circuit held that Pennsylvania's two-step qualification framework—the same as New Mexico's—was not "an unacceptable burden." *Id.* at 196. There is no reason the Court here should not similarly conclude, as the *Rogers* court did, that the two-step framework in New Mexico's Election Code does not unduly burden plaintiffs.

The only case plaintiffs cite where a court struck down a two-step qualification system is *Maryland Green Party v. Maryland Bd. of Elections*, 832 A.2d 214 (Md. 2003). Doc. 8 at 2. But that case is distinguishable on numerous fronts. First, the case centered entirely on the Maryland constitution, a violation of which the court made clear "is not necessarily a violation" of the Federal

[4] Since *Rogers*, the Third Circuit invalidated part of this framework because it allowed members of the public to object to nomination papers submitted for minor party candidates. *Constitution Party of Pennsylvania v. Cortes*, 924 F.3d 386 (3d Cir. 2016). The objection would result in a hearing, potentially voiding the petition and awarding costs. *Id.* at 390–91. That additional hurdle was a bridge too far for the Court, as applied to the specific plaintiffs. *Id.* at 395 n.14.

Constitution. *Id.* at 158 (internal quotation and citation omitted). There are also significant factual differences between New Mexico's system and Maryland's. The *Maryland Green Party* court took issue with minor political parties having a signature requirement while major political parties could rely on candidate performance in previous elections to automatically qualify different candidates in future elections. *Id.* at 159–60. New Mexico, on the other hand, requires *both* major and minor parties to submit signatures to qualify for the ballot. *See* N.M. Stat. Ann. §§ 1-8-2, 1-8-33. Major parties in New Mexico even have a more limited signer pool, because their candidates may only collect signatures from voters registered *with* the party, whereas minor party candidates may collect signatures from any voter, regardless of party affiliation. *See* N.M. Stat. Ann. § 1-8-33(B). Even if there are differing burdens, for regulations on major and minor political parties "there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other." *Jenness*, 403 U.S. at 441.

The *Maryland Green Party* court also found that the individual candidate's signature requirement added nothing to the party's signature requirement, because the candidate had to collect far fewer signatures than the party. 832 A.2d at 164. New Mexico, as shown by plaintiffs themselves, would require more signatures of individual candidates than their party. *Compare* N.M. Stat. Ann. § 1-7-2(A) (requiring 0.5% of total vote) *with* N.M. Stat. Ann. § 1-8-2(B) (requiring up to 2% of the total vote). And even if New Mexico had not, a signature in support of a party forming is certainly different in kind from a signature in support of a candidate running for office. *Maryland Green Party*, 832 A.2d at 167 (Harrell, J., concurring) ("Voters who sign the party-recognition petition neither are pledging their loyalty to the party nor promising to support

a particular candidate in a future election."). *Maryland Green Party* simply offers no persuasive application to this case.

To the extent plaintiffs complain about the timing of forming a party and qualifying candidates, this Court has already rejected that argument in the past. "[T]here is no requirement that a party (if it anticipates being unable to complete the new party and candidate petitions) run candidates the year that it is recognized . . . and there is nothing that prohibits a political party from seeking to be qualified as a political party well before the election in which they wish to run candidates." *Vigil-Giron*, 2006 WL 8443845, at *10. As explained above, NMFP could have formed earlier; the burden on its candidates to gather signatures in a short timeframe is self-inflicted due to its late certification as a political party.

Finally, although plaintiffs argue that the burden imposed by New Mexico's Election Code is so severe that it effectively freezes the status quo, Doc. 8 at 12–13, the fact that three of NMFP's own candidates—60% of the individual plaintiffs—qualified for this year's ballot defeats the argument. Moreover, New Mexico has a history of third party and independent candidates qualifying for the ballot. In addition to the plaintiffs, three candidates from the Libertarian Party qualified for this year's ballot. *See* Vigil Decl., ¶ 11. In the last ten years, fourteen candidates from parties like the Green Party, Constitutional Party, American Delta Party, and Better for America Party have qualified, both for local and statewide elections. *Id.* Until 2025, the Libertarian Party even garnered enough votes in New Mexico elections to qualify as a major political party for seven years. *Id.* ¶ 12. Plaintiffs are simply incorrect that the New Mexico's Election Code imposes such a massive burden on minor political candidates that they have no access to the ballot.

**2. The Public Interest in New Mexico Demonstrably Outweighs the Burden on Plaintiffs**

Plaintiffs claim that New Mexico has no interest whatsoever in imposing its signature requirements on minor political party candidates. Doc. 8 at 14. But the interests are apparent, have been recognized by court after court, and are "admittedly vital." *Am. Party of Tex.*, 415 U.S at 782. A functioning democracy is not served by a disorganized election, and the Constitution imparts on states the power to regulate the election process. U.S. Const. Art. I, § 4, cl. 1. It is "clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election—and campaign—related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). In order to prevent overcrowding, voter confusion, and frivolous candidacies that could otherwise result, States have an "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986). They may thus constitutionally impose requirements that candidates show "a significant modicum of support . . . ." *Jenness*, 403 U.S. at 442.

New Mexico's interests are served by its two-step framework. A political party can form at any time, and doing so does not require a signatory to have any intent to support the party's candidates in the future. N.M. Stat. Ann. § 1-7-2. A minor political party may have very few members as well, lending more credence to the need for an individual candidate to demonstrate some modicum of support to appear on the ballot. NMFP is a prime example—at the time of briefing, it only has 227 registered members. Vigil Decl., ¶ 13. New Mexico is serving the interests of its populace by requiring such a party to have its candidates show additional support before appearing on a general election ballot. "The fact that a minor political party has earlier shown a modicum of support by meeting a separate goal, which entails a separate distinction, does not render the burden [on an individual candidate] an improper one." *Rogers*, 468 F.3d at 196; *see also*

*Libertarian Party of Maine v. Diamond*, 992 F.2d 365, 371 (1st Cir. 1993) (even though a party may have demonstrated support by the performance of candidate in an earlier election, resulting in the party qualifying by riding that candidate's coattails, "the State retained a legitimate interest in ensuring that the Party in fact possessed a minimal level of support among the electorate, as a prerequisite to listing the appellant candidates on the primary and general election ballots."). Major parties in New Mexico have similar requirements they must meet. N.M. Stat. Ann. § 1-8-33. That plaintiffs complain of the magnitude of signatures required does not undermine New Mexico's interests in regulating its elections. "To hold otherwise risks infringing on an area traditionally allocated to the states." *Rogers*, 468 F.3d at 197.

The burden on plaintiffs is not so severe as to require the Secretary to put forth specific facts supporting the challenged statutes, as plaintiffs demand. Doc. 8 at 14–15. Indeed, as this Court has recognized, "The Supreme Court has 'never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access.'" *Parker v. Duran*, 180 F. Supp. 3d 851, 861 (D.N.M. 2015) (quoting *Munro*, 479 U.S. at 194–95). Even if there was a need, New Mexico has a history of revising its Election Code to address specific occasions where its interests were being undermined. For instance, in 1992's general election six third-party and independent candidates for President appeared on the ballot in New Mexico, and received 0.1% of the vote or less. *Vigil-Giron*, 2006 WL 8443845, at *6) (citing 41st Legislature, First Session 1993, House Memorial #56). New Mexico's Legislature found that, absent requirements that would demonstrate a candidate's modicum of support, there was an ever-increasing number of third-party and independent candidates that caused issues with preparing the ballot for voting machines. *Id.* It

requested that the Secretary of State review the Election Code and offer recommendations, resulting in some of the ballot access requirements in the Election Code today. *Id.*

Going further back, the New Mexico Supreme Court reckoned with ballot access restrictions in the Election Code in *Dillon v. King*, 1974-NMSC-096, 87 N.M. 79. There, three candidates wanted to run in the Democratic primary for United States Senate, failed to qualify, and challenged petition requirements. *Id.* ¶¶ 7, 16–17. In recognizing New Mexico's interest in regulating its ballots, the Court noted the "real and present danger in New Mexico" of overcrowding and frivolous candidates. *Id.* ¶ 12. In the 1972 Democratic primary for Senate in New Mexico, "twenty-eight candidates filed of whom twenty-five" appeared on the ballot. *Id.* The most successful candidate received 45,648 votes, while the least successful candidate—Santa Fe's legendary street artist Tommy Macaione, also known as El Diferente—received only 252. *Id.*

This history forms the backdrop of New Mexico's present Election Code. Regardless of party status (major, minor, or independent), each party nominee must show some modicum of support by soliciting signatures from voters—the very electorate who would vote in the election itself—to avoid known frivolous candidacies. N.M. Stat. Ann. §§ 1-8-2, 1-8-33, 1-8-51. Indeed, even if every voter who is currently registered as a member of NMFP voted for its own candidates, plaintiffs would still only receive 227 votes. Vigil Decl., ¶ 13. This is fewer than the candidate who received 252 in *Dillon* that the court used as an exemplar of frivolous candidacies. 1974-NMSC-096, ¶ 12. Given New Mexico's history and recognized interests, the challenged statutes are reasonable. They are also nondiscriminatory. *See Werme v. Merrill*, 84 F.3d 479, 484 (1st Cir. 1996) (finding nondiscrimination when regulations do "not differentiate among Republicans, Democrats, and Libertarians" on their face).

On balance, the slight burden on plaintiffs to obtain signatures in an amount far fewer than numbers approved by the Supreme Court does not outweigh New Mexico's interest in preventing ballot overcrowding, voter confusion, and frivolous candidacies. *See Diamond*, 992 F.2d at 371 (requiring support for individual candidates "is meant to safeguard the integrity of elections by avoiding overloaded ballots and frivolous candidacies, which diminish victory margins, contribute to the cost of conducting elections, confuse and frustrate voters, increase the need for burdensome runoffs, and may ultimately discourage voter participation in the electoral process.") (citing *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 183–84 (1979) and *Bullock*, 405 U.S. at 145). For their own benefit, plaintiffs ask the Court to disrupt the framework the Legislature has developed to protect such interests. "The extraordinary remedy that the moving plaintiffs seek—ballot access for their candidates without any showing of support—would eliminate the state's ability to protect these important interests and would result in the discriminatory treatment of other minor parties." *Libertarian Party of Connecticut v. Merrill*, 470 F. Supp. 3d 169, 189 (D. Conn. 2020). Plaintiffs cannot show that the signature requirements imposed by the Election Code are unconstitutional.

### C. New Mexico's Restriction on When Candidates May Petition to Appear on the Ballot does not Violate the First Amendment

In addition to the signature requirements, plaintiffs attack the time which New Mexico permits minor political party candidates to collect signatures. Doc. 8 at 16–17. According to plaintiffs, the restriction impinges on speech protected by the First Amendment, discriminates based on viewpoint, and is thus subject to strict scrutiny. *See id.* As support, they rely on *Meyer v. Grant*, 486 U.S. 414 (1988). But *Grant* is not instructive here. Although the Supreme Court struck down a restriction on who may solicit signatures for ballot initiatives, *id.* at 426, New Mexico has no similar restriction—anyone can petition for signatures to support candidates and may hire

anyone else to do so. Moreover, the law at issue in *Grant* had a similar restriction to one present in New Mexico that the Court did not find problematic. The petition scheme in *Grant* included a window of time to secure signatures, six months, just as New Mexico makes its official petition form available for a specific period of time. *Id.* at 416. Finally, the *Grant* court's concerns stem largely from restrictions on "the power of the people to initiate legislation," but plaintiffs' challenge here is to a candidate's ability to appear on a ballot. *Id.* at 423. Court after court has recognized a state's ability to put limits on candidates seeking ballot access. *See supra*, at 8–15.

The parties agree § 1-8-65 puts a limit on the time a party may solicit petitions by restricting the petition to a form promulgated by the Secretary. But the Secretary does not agree that § 1-8-65 discriminates based on viewpoint—or subject matter—at all, and thus is not subject to strict scrutiny. Rather, it is a content-neutral and reasonable time, place, and manner restriction.

"A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 695 (2010). In *Christian Legal Society*, for example, the Supreme Court addressed a university's policy limiting recognition of student groups to those who agree to open eligibility of all students. *Id.* at 667. The Christian Legal Society challenged the policy by arguing, in part, that it "burdens most heavily those groups whose viewpoints are out of favor with the campus mainstream." *Id.* at 695. The Court disagreed, because the policy was "justified without reference to the content or viewpoint of the regulated speech." *Id.* at 696 (internal citation and brackets omitted). Rather than the content of the school group's speech, the policy targeted "the *act* of rejecting would-be group members without reference to the reasons motivating that behavior." *Id.*

Here, § 1-8-65 is targeted at a specific act: gathering signatures for candidacy. It places no restriction whatsoever on a candidate's ability to speak about their platform, policies, or party. A party could at any time send a digital communication blast throughout the state asking residents to support its preferred candidate, similar to what NMFP did here, and build support leading up to the time when petitions are available to sign. And § 1-8-65 is plainly neutral on what platform or candidate a given minor political party may choose to support. The petition requirement does not, for example, restrict candidates from petitioning on a platform that supports funding education, libraries, infrastructure, or any other viewpoint. Any allusion from plaintiffs to suggest that § 1-8-65 somehow favors the viewpoints of Democrats or Republicans, *see* Doc. 8 at 19, is soundly undermined by the statute itself. § 1-8-65 applies to "minor political parties," and a separate petition requirement and time frame exists for "major political parties" in § 1-8-33. The statutes are neutral on what party qualifies as either category under the law, and indeed which existing party meets those categories is subject to change. Vigil Decl., ¶ 12. § 1-8-65, therefore, is content neutral, neither restricting what a candidate can say or the viewpoint they express.

Instead, § 1-8-65 is a reasonable time, place, and manner restriction that serves New Mexico's significant interest in avoiding voter confusion and frustration. "Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). "Thus, the essence of time, place, or manner regulation lies in the recognition that various methods of speech, regardless of their content, may frustrate legitimate governmental goals. No matter what its message, a roving sound truck that blares at 2 a. m. disturbs neighborhood tranquility." *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm. of N.Y.*, 447 U.S. 530, 536 (1980). The Supreme Court has thus permitted restrictions, for example, on when or where a person can organize a parade,

hold a demonstration, or screen adult films. *See Cox v. New Hampshire*, 312 U.S. 569 (1941); *Grayned v. City of Rockford*, 408 U.S. 104 (1972); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).

Section 1-8-65 does not restrict the content of speech, but the act of gathering signatures for a candidate, and when that may occur. As a matter of practice, a candidate could gather support at any time, but the form on which the Secretary will accept signatures is not available until October, for major party candidates to get on the primary election ballot, and March, for minor party candidates to get on the general. This limitation serves two functions. First, it prevents candidates from confusing voters by limiting their soliciting to the relevant election. If a candidate could solicit signatures at any time, a voter may not know when the candidate will actually run. And as a practical matter, the Secretary would not know when the signature was obtained and if it was valid for the specific election. Staggering the timeline for major and minor parties also serves this interest, because it prevents confusion between which candidates are gathering preprimary support—the major party candidates—and those that do not run in primaries—minor party candidates. *See* N.M. Stat. Ann. § 1-8-33. That the State may treat the two categories of parties differently is supported by the cases. *See Rogers*, 468 F.3d at 193.

Second, the limit on when the petition is available for candidates eases voter fatigue. As demonstrated by NMFP, voters in the state are already susceptible to mass, unsolicited communications from candidates during the petition period. The NMFP alone sent 1.166 million texts to New Mexicans within its 41-day petition period. All parties and candidates are of course free to espouse their platforms at any time and to anyone, but § 1-8-65 serves as a reasonable restriction on the time period for which the State will accept the results of those solicitations for purposes of entry on the ballot. *Anderson*, 460 U.S. at 788 ("[N]ot all restrictions imposed by the

States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters rights to associate or to choose among candidates."). Thus, § 1-8-65, while not actually prohibiting any speech or viewpoint, serves to protect voters from frustrating or confusing solicitations that are unclear about when a candidate will run or how to support them.

Because § 1-8-65 is a content-neutral and reasonable time, place, and manner restriction, plaintiffs cannot show that it violates their First Amendment rights.

## II
## ABSENT A DEPRIVATION OF CONSTITUTIONAL RIGHTS, PLAINTIFFS FACE NO IRREPARABLE HARM

The Court need not consider the remaining requirements for a preliminary injunction absent a likelihood of success on the merits. *See, e.g.*, *Merrill*, 470 F. Supp. 3d, at 189. Even if it does, the plaintiffs will not suffer irreparable harm if this Court refuses to issue a preliminary injunction. The plaintiffs' only basis for arguing irreparable harm is that, absent an injunction, the two candidates who failed to qualify will be excluded from the 2026 general election. Doc. 8, at 20. But plaintiffs do not have an unqualified right to appear on a ballot; as explained above, New Mexico may place appropriate requirements on would-be candidates to show they have sufficient support. The presence of irreparable injury to plaintiffs' rights "turns on whether the plaintiff has shown a clear likelihood of success on the merits," and they have not. *See SAM Party of New York v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021).

## III
## AN INJUNCTION FORCING NEW MEXICO TO PUT PLAINTIFFS ON THE BALLOT IS CONTRARY TO THE PUBLIC INTEREST

Plaintiffs assert that the equities favor them rather than the State, and that their requested relief—being placed on the ballot—would be in the public interest. These inquiries are one and the same in suits against the government. *Id.* ("In a suit against the government, balancing of the

equities merges into our consideration of the public interest.”). Moreover, the balancing is addressed already between plaintiffs’ asserted burden to obtain a position on the ballot and the State’s interest in well-regulated elections. Under that balancing the State’s interest outweighs the plaintiffs’. *See supra*, at 8–15. As the Supreme Court has recognized, “[t]he means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not.” *Lubin v. Panish*, 415 U.S. 709, 715 (1974). Preventing a state “from conducting this year’s elections pursuant to a statute enacted by the Legislature,” unless unconstitutional, would “seriously and irreparably harm the State.” *Abbott v. Perez*, 585 U.S. 579, 602 (2018).

Although plaintiffs complain that the remaining candidates on the ballot will be major party candidates if they are not permitted to appear, Doc. 8 at 21, that alone is not sufficient. “[W]hile some voters would surely like to see” NMFP on the ballot, “the interest of those voters does not outweigh the broader public interest in administrable elections,” and ensuring candidates “enjoy a modicum of electoral support,” beyond that of the party itself. *See Kosinski*, 987 F.3d at 278; *Vigil-Giron*, 2006 WL 8443845, at *10.

Finally, granting a preliminary injunction would cause extreme disruption to the Legislature’s carefully constructed regulation of ballot access, without any corresponding demonstration of entitlement by these plaintiffs. The two NMFP nominees who failed to qualify under the Election Code would be placed above all other minor party candidates, even their fellow NMFP party members, and given special access to the ballot based on a preliminary assessment by the Court of their claims. Doing so also risks interference with the Secretary’s election preparation. Time is of the essence in elections; preparing ballots must meet strict statutory deadlines, ballots must be tested to ensure they are compatible with tabulation machines, and they

must be proofed by the county clerks. *See, e.g.*, N.M. Stat. Ann. § 1-10-4(B) (2023) (requiring each county to certify its ballot "not less than sixty-seven days before the election"); Vigil Decl., ¶ 15. Changing the ballot is not simple, and when done partway through the Secretary's proofing process it can lead to errors, undermining the State's ability to accurately count all votes. Vigil Decl., ¶ 15.

"The extraordinary remedy that the moving plaintiffs seek—ballot access for their candidates without any showing of support—would eliminate the state's ability to protect these important interests and would result in the discriminatory treatment of other minor parties." *Merrill*, 470 F. Supp. 3d at 189. The Secretary certainly agrees in principle that a democratic government is served by third-party access to the ballot—provided the party and the candidate merit it. But that interest is already protected by the Election Code and manifested by the third parties that have qualified year over year. Vigil Decl., ¶ 11. The public's interest is better served by leaving the Election Code intact rather than forcing the public to accept candidates who failed to demonstrate the reasonable level of support to qualify for the ballot.

**CONCLUSION**

For all the reasons explained above, plaintiffs cannot establish that §§ 1-7-2(A), 1-8-2(B), 1-8-2(E), or 1-8-65 violate the First and Fourteenth Amendments, and so imposing a preliminary injunction to allow plaintiffs' failed candidates to appear on the ballot would harm the public interest. The plaintiffs' motion should therefore be denied.

Dated: August 14, 2026.

Respectfully submitted,

BARDACKE ALLISON MILLER LLP

By: */s/ Justin Miller*
Justin Miller
Michael Woods
141 E. Palace Avenue
Santa Fe, NM 87501
505-995-8000
justin@bardackeallison.com
michael@bardackeallison.com

*Counsel for Defendant Maggie Toulouse Oliver, in her official capacity as Secretary of State of New Mexico*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing to be filed through the Court's CM/ECF system, which caused all parties and counsel entitled to receive notice to be served electronically as more fully described on the Notice of Electronic Filing.

BARDACKE ALLISON MILLER LLP

By: */s/ Justin Miller*