**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| NEW MEXICO FORWARD PARTY, BOB PERLS, MICHAEL VIGIL, DENNIS DINGE, HARRY MONTOYA and FRANCES KAVA,<br><br>Plaintiffs,<br><br>v.<br><br>MAGGIE TOULOUSE OLIVER, in her official capacity as Secretary of State of New Mexico, and BARBARA DELANEY, in her official capacity as County Clerk of Luna County, New Mexico,<br><br>Defendants. | No.: 1:26-cv-02286-MIS-SCY |

**PLAINTIFFS' OPPOSED EMERGENCY MOTION FOR STAY AND INJUNCTION PENDING APPEAL**

Plaintiffs New Mexico Forward Party ("NMFP"), Bob Perls, Michael Vigil, Dennis Dinge, Harry Montoya and Frances Kava, through undersigned counsel, move under Federal Rule of Appellate Procedure 8(a)(1) and Federal Rule of Civil Procedure 62(d) for an injunction pending appeal directing Defendant Secretary of State to place Plaintiff Perls (U.S. Senate) and Plaintiff Vigil (State Auditor) on New Mexico's November 3, 2026 general election ballot as NMFP's nominees, and for a stay of the Order Denying Motion for Preliminary Injunction, ECF No. 22 (Sept. 2, 2026) (the "Order"), pending Plaintiffs' interlocutory appeal to the Tenth Circuit.

Plaintiffs are likely to prevail on their appeal in this ballot access case because the Order's analysis rests on a demonstrably false premise. Plaintiffs challenge the constitutionality of New Mexico's statutory scheme primarily because it requires that Plaintiffs submit 10 separate petitions

with 131,361 total signatures to qualify NMFP and its candidates for statewide office for the general election ballot. Yet the Order measures the burden imposed on Plaintiffs' First and Fourteenth Amendment rights based on the 14,200-signature requirement that New Mexico imposes on just one NMFP candidate for statewide office. Plaintiffs do not seek to run a single candidate for statewide office. Plaintiffs seek to establish a political party and run candidates for all offices—federal, state and local—and consequently the burden imposed must be measured based on what New Mexico actually requires of them. That is not a single petition with 14,200 signatures, as the Order incorrectly concludes, but 10 separate petitions with 131,361 total signatures (for statewide offices only; a separate and additional petition is required for each candidate for the hundreds more district and local offices). As set forth below, the Order commits additional errors, but this fundamental error that misstates and minimizes the burden imposed on Plaintiffs' First and Fourteenth Amendment rights warrants an immediate stay.

Because ballots must be finalized within days, Plaintiffs respectfully request a ruling as soon as practicable, and state that they reserve their right to seek the same relief from the Tenth Circuit under Fed. R. App. P. 8(a)(2).

Pursuant to D.N.M. LR-Civ. 7.1(a), Plaintiffs sought Defendants' concurrence in the relief requested. Defendants' respective counsel advised that Defendant DeLaney does not oppose the motion but Defendant Toulouse-Oliver does. The motion is therefore opposed.

**The Question Presented on Appeal**

New Mexico's statutory scheme regulating ballot access is unique. Like many states, New Mexico requires a new political party to submit a petition to become ballot-qualified, but then, unlike any other state, New Mexico also requires that each candidate nominated by the party submit a separate petition to qualify for the general election ballot. As a result, New Mexico's

statutory scheme is uniquely burdensome: as applied in 2026, it required NMFP to submit 10 separate petitions with 131,361 total signatures to qualify a full slate of candidates for statewide office. No other state requires so many signatures to qualify a slate of statewide candidates, and no other state is even close. Additionally, each candidate for the hundreds more district and local offices is also required to submit a separate petition, subject to its own signature requirement.

Plaintiffs claim this statutory scheme violates their First and Fourteenth Amendment rights. Applying the *Anderson/Burdick* analysis, the District Court declined to measure the burden imposed on Plaintiffs' rights based on the actual total number of signatures it requires, but instead measured the burden based on the signatures required of a single candidate, which was 14,200. Concluding that such a requirement was reasonable, the District Court applied a deferential standard of review and upheld New Mexico's statutory scheme. Did the District Court err by minimizing the burden New Mexico's statutory scheme imposes, by disregarding facts and evidence establishing it as severe, and thus applying an improperly deferential standard of review?

## I. Procedural Posture and the Facts the Order Accepted.

Plaintiffs moved for a preliminary injunction on July 27, 2026, ECF No. 8; the Court heard the motion on August 28, 2026, ECF No. 21, and denied it on September 2, 2026, ECF No. 22. Plaintiffs have filed a Notice of Appeal to the United States Court of Appeals for the Tenth Circuit. ECF No. 24. An order denying a preliminary injunction is immediately appealable under 28 U.S.C. § 1292(a)(1).

The Order accepts the following facts. NMFP filed its qualifying petition on May 8, 2026 and was certified as a minor political party on May 14, 2026. Order at 10. Because NMFP had 227 registered members, § 1-8-2(B) required each of its statewide nominees to submit a petition

bearing 14,200 signatures by June 25, 2026. *Id.* at 3, 9–10. Perls and Vigil therefore had 41 days to petition. *Id.* at 16.

For 25 to 29 of those 41 days, Perls and Vigil could not use the State's online petitioning platform. The Election Code freezes voter registration processing from May 5 through June 8, §§ 1-4-8(A), (B), (D), and because NMFP was certified during that freeze, Perls and Vigil "could not update their registration to reflect NMFP until June 8, 2026," and "could not use the online system to obtain signatures until June 8, 2026." Order at 10. Their declarations place actual availability at June 12. *Id.* at 10–11. The Court found that, "[d]ue to NMFP's timing, . . . candidate access to the online system was restricted." *Id.* at 10.

Perls and Vigil were diligent. Plaintiffs spent roughly $63,000, including $44,500 on a digital campaign that sent 1.66 million text messages to more than 500,000 registered voters; more than 56,000 of those voters tried to sign online, but the closed platform yielded fewer than 2,700 signatures. Order at 11. Perls also deployed paid circulators to gather wet signatures at public events. *Id.* at 10. Vigil submitted 4,400 signatures and Perls 2,700, *id.* at 11—each more than the 2,505 and 2,351 signatures New Mexico required of Democratic and Republican statewide candidates seeking the primary ballot. Mot. at 6, ECF No. 8 (citing Compl. ¶ 44).

The three NMFP nominees who reached the ballot ran for local office: Dinge (Public Education Commission, 1,014 signatures), Montoya (Santa Fe County Magistrate, 928 signatures), and Kava (Luna County Magistrate, 59 signatures). Mot. at 9–10, ECF No. 8; Order at 11.

## II. Plaintiffs Satisfy Each Factor Necessary to Obtain an Injunction Pending Appeal.

A stay or injunction pending appeal turns on four factors: (1) whether the applicant has made a strong showing of likely success on the merits; (2) whether the applicant will be irreparably injured absent relief; (3) whether relief will substantially injure the other parties; and (4) where the

public interest lies. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). When the government is the opposing party, the last two factors merge. *See id.* at 435; *Ortega v. Grisham*, 148 F.4th 1134, 1142 (10th Cir. 2025). The Tenth Circuit has granted injunctive relief pending appeal in a First Amendment election case on this showing. *See Homans v. City of Albuquerque*, 264 F.3d 1240, 1243 (10th Cir. 2001).

Rule 8(a)(1) requires that Plaintiffs seek such relief in the District Court first. Plaintiffs recognize that asking the Court to enjoin what it has just declined to enjoin is likely futile, and courts treat that futility as satisfying Rule 8(a)'s prerequisite so that the movant may proceed to the Court of Appeals. *See In re Flint Water Cases*, 960 F.3d 820, 825 (6th Cir. 2020); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410–11 (5th Cir. 2013). Plaintiffs nonetheless file this motion so that the record on the Rule 8 factors is complete and so that this Court may correct the errors identified herein without appellate intervention.

The Order applied the heightened standard for "disfavored" injunctions on the premise that placing two names on a ballot is a mandatory injunction that alters the status quo and grants all relief available at trial. Order at 8 (citing *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975–76 (10th Cir. 2004)). That premise is incorrect. An injunction is disfavored on the ground that it grants all available relief only when it gives the movant everything it could win at trial. *See Center for Civic Action v. City of Albuquerque Bd. of Ethics & Campaign Practices*, 2025 WL 3485749 (D.N.M. Dec. 4, 2025) (identifying the three characteristics of a disfavored injunction); *Curtis v. Oliver*, 479 F. Supp. 3d 1039 (D.N.M. 2020) (same). This Court accordingly declines to apply the heightened standard where, as here, the Complaint seeks declaratory relief that the interim motion does not. *See City of Albuquerque v. Barr*, 515 F. Supp. 3d 1163, 1173-74 (D.N.M. 2021). Plaintiffs' Complaint seeks declaratory relief against provisions

that will govern every future cycle, *see* Compl. ¶¶ 86–87, 90, ECF No. 1, whereas the preliminary relief sought here is ballot placement for two nominees in one election. Nor is that relief "mandatory" in the relevant sense. This Court has declined to treat ballot-placement relief as mandatory merely because it is phrased affirmatively, where compliance requires no ongoing judicial supervision and any infraction can be reported to the court. *See Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1028 (D.N.M. 2016). And even where the disfavored-injunction framework applies, it calls for closer scrutiny of whether the exigencies of the case support relief, not a mechanical bar. *See Voter Reference Found., LLC v. Balderas*, 616 F. Supp. 3d 1132, 1252, 1275 (D.N.M. 2022) (granting preliminary injunction despite finding it "disfavored" because the requested relief would alter the status quo). The exigency here is that denial of interim relief is final: no judgment after November 3 can put Perls and Vigil on the 2026 ballot, and their exclusion will harm the First Amendment rights of all New Mexicans who may wish to vote for them, including not only Plaintiffs but also the thousands of voters who signed Plaintiffs' petitions. The heightened standard therefore does not apply. Even so, Plaintiffs make the strong showing the Order demanded.

## III. Plaintiffs Are Likely to Succeed on Appeal Because the Order Misapplied the *Anderson/Burdick* Analysis.

### A. The Order Misstates and Minimizes the Burden Imposed on Plaintiffs.

When courts apply the *Anderson/Burdick* analysis, "much of the action takes place at the first stage"—identifying the character and magnitude of the burden on plaintiffs' rights—because that is what determines the level of scrutiny the court must apply. *Stone v. Bd. of Election Comm'rs for City of Chicago*, 750 F.3d 678, 681 (7th Cir. 2014). It is therefore critical that courts properly characterize the burden lest they apply an improper standard of review. The Order fails to do so. It misstates and minimizes the burden imposed on Plaintiffs and disregards facts and evidence

establishing that burden as severe. As a result, the Order applies an improperly deferential standard to uphold ballot access requirements that are unconstitutional under well-settled precedent.

The Order states that Plaintiffs "misrepresent[]" the burden New Mexico imposes on them by measuring it based on the 10 separate petitions with a total of 131,361 signatures they must submit to qualify a slate of statewide candidates. Order at 18. Because "the onus is not on the party to gather signatures for their candidates," the Order reasons, "it is inaccurate to portray the signature requirement as one imposed on the party to field a full statewide slate." *Id.* at 19. Instead, the Order measured the burden based on the number of signatures required of a single candidate for statewide office—14,200—and found it to be "a reasonable burden, not a severe one…." *Id.*

As a threshold matter, the Order's reasoning contradicts the plain language of both Plaintiffs' Complaint and New Mexico statutory law. Plaintiff NMFP "seeks to qualify candidates for the ballot in local, state and federal elections in New Mexico, to grow and develop as a political party … and to promote and build support for its platform among New Mexico voters." Compl. ¶¶ 6, ECF No. 1 (emphasis added). Each individual Plaintiff also seeks "to campaign for, speak and associate with and vote for NMFP's candidates, and … is harmed by their exclusion from New Mexico's general election ballot." Compl. ¶¶ 7-11, ECF No. 1. Furthermore, it is black letter law that to accomplish these objectives in 2026, Plaintiffs were required to submit not one petition with 14,200 signatures, but 10 separate petitions with 131,361 signatures (for statewide offices only). *See* New Mexico Statutes § 1-7-2(A) (establishing minor party petition requirement);[1] § 1-8-2(B)(1) (establishing minor party candidate petition requirements); *see also* New Mexico Office of the Secretary of State, *2026 Nominating Petition for Minor Parties and Decline to State (Independent) Candidates Calculations ("Petition Calculations")*, at 2 (calculating each

[1] Hereinafter, all statutory citations are to the New Mexico Statutes unless otherwise indicated.

candidate's signature requirement) (attached as Exhibit A).[2] Consequently, by measuring the burden on Plaintiffs as if they seek to run just one candidate for statewide office, rather than to run candidates for all offices as they allege, it is the Order—not Plaintiffs—that "misrepresents the burden on Plaintiffs." Order at 18.

The Order's reasoning is also irreconcilable with Supreme Court precedent. Plaintiffs have a "constitutional right … to create and develop [a] new political part[y]." *Norman v. Reed*, 502 U.S. 279, 288 (1992). That right "means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." *Williams v. Rhodes*, 393 U.S. 23, 31 (1968); *see also Kusper v. Pontikes*, 414 US 51, 58 (1973) (recognizing that "a basic function of a political party is to select the candidates for public office to be offered to the voters at general elections."). Similarly, "the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." *Id*. Furthermore, "the rights of voters and the rights of candidates do not lend themselves to neat separation [because] laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock v. Carter*, 405 U.S. 134, 143 (1972). As this well-settled precedent establishes, the 10 separate petitions with 131,361 signatures that New Mexico required Plaintiffs to submit to run a full slate of statewide candidates burden Plaintiffs' rights not only as *candidates*, as the Order incorrectly concludes, Order at 18-19, but also as *voters* and *citizens who seek to grow and develop a new political party*. Plaintiffs have submitted uncontested evidence that New Mexico's statutory scheme severely burdened these rights. Perls Decl. ¶¶ 4, 7-8, 11, ECF No. 8-3; Vigil Decl. ¶ 3, ECF No. 8-2; Montoya Decl. ¶ 3, ECF No. 8-4; Kava Decl. ¶ 3, ECF No. 8-5; Dinge Decl. ¶ 3,

[2] The Petition Calculations are in the District Court record. They were formerly available online at https://www.sos.nm.gov/wp-content/uploads/2026/04/2026-Nominating-Petition-Calculationsfor-Minor-Parties-and-Independent.pdf (last accessed July 23, 2026), and are attached herewith for the Court's convenience.

ECF No. 8-6. The Order's failure to address the burden on these rights, or the actual burden imposed on all NMFP candidates rather than just a single candidate, was clear error.

The Order suggests that Plaintiffs were artificially "bumping the number up" by measuring the burden New Mexico imposes on NMFP and its candidates and voters rather than just a single candidate, Order at 18, but Plaintiffs did nothing more than accurately state the requirements they must meet to qualify as a party and place their candidates on the general election ballot. That is not in dispute. And that is why the evidence Plaintiffs submitted regarding other states' requirements is relevant to the constitutional analysis. The Order acknowledges that Plaintiffs submitted such evidence but fails to identify the evidence or provide a basis for its summary conclusion that the evidence is insufficient to support Plaintiffs' claims. Order at 17-18. Plaintiffs did not merely submit evidence of "the lesser signature requirements of Texas, Utah, and Colorado," as the Order states. Order at 17. Rather, Plaintiffs' Motion states:

> The 10 petitions containing 131,361 signatures that New Mexico requires of a minor party to place its nominees for statewide office on the general election ballot is, by far, greater than the requirement imposed by any other state. Winger Decl. ¶ 21. The next closest state is Texas, which in 2026 imposed a requirement of 81,030 signatures. Winger Decl. ¶ 21; *see* TEX ELEC. CODE § 181.005(a) (minor parties qualify to place nominees on general election ballot by submitting petition with signatures equal in number to 1 percent of total vote for Governor in preceding election). Thus, while Texas's population of approximately 31.7 million dwarfs that of New Mexico's population of approximately 2.1 million, *see* Stats America, Population Estimate for 2025, available at https://www.statsamerica.org/sip/rank_list.aspx?rank_label=pop1 (accessed July 25, 2026) (citing U.S. Census Bureau data), New Mexico's signature requirement is more than 38 percent greater than Texas's. By contrast, in New Mexico's neighboring state of Colorado (population 6 million, *see id.*), a single petition with 10,000 signatures qualifies a minor party to place its nominees for all offices on the general election ballot. Winger Decl. ¶ 19. And in Utah (population 3.5 million, *see* Stats America, *supra*), a single petition with 2,000 signatures is sufficient. Winger Decl. ¶ 18.

Pl. Mot. for Prel. Inj. at 10-11, ECF No. 8.

Contrary to the Order's characterization, therefore, Plaintiffs' evidence does not just establish that other states impose "lesser" requirements than New Mexico, but that New Mexico's

requirements are far more severe than any other state and that they are wildly disproportionate to New Mexico's asserted interest in requiring that Plaintiffs demonstrate a "modicum of support." New Mexico's requirements are more than 13 times greater than Colorado's, and more than 65 times greater than Utah's, even though both states have significantly larger populations than New Mexico. The yawning disparity between New Mexico's highest-in-the-nation requirements and those of its neighboring states—including those of Texas, despite Texas's vastly larger population—supports the conclusion that New Mexico's requirements are far more restrictive than necessary to further any legitimate state interest. Furthermore, Defendants do not dispute the foregoing evidence, and even if they did, it is supported not only by citation but also by the sworn testimony of Richard Winger, a nationally-recognized expert in ballot access law who has testified as a fact witness and expert witness in countless cases. Winger Decl., Ex. A, at 3-10, ECF No. 8-1.

The Order's rationale for declining to credit Plaintiffs' uncontested evidence is not persuasive. The Order notes the "disparity" in the type of ballot access requirements that states impose and in state populations, Order at 18, but Plaintiffs' evidence controls for those disparities. It only compares New Mexico's requirements for running a full slate of candidates for statewide office with those of other states. Furthermore, unlike the Order, Plaintiffs' evidence addresses the disparity in state populations and demonstrates that the disparity supports rather than undermines Plaintiffs' claims: New Mexico, with its significantly smaller population, has no legitimate interest in imposing requirements vastly greater than other states with significantly larger populations. "[F]inally," the Order concludes, "even if New Mexico did have the most stringent ballot-access framework compared to other states, that does not make it unconstitutional." Order at 18. Again, however, this generality misstates Plaintiffs' position by eliding the specific facts. Plaintiffs do not

argue that New Mexico's requirements are unconstitutional merely because they are the most stringent in the nation, but because they are 13 times greater than Colorado's, 65 times greater than Utah's, and greater even than Texas's, all of which supports the conclusion that New Mexico's are unnecessarily restrictive by many orders of magnitude.

The Supreme Court has recognized that ballot access requirements are also severely burdensome if they "operate to freeze the political status quo." *Jenness v. Fortson*, 403 U.S. 431, 438 (1971). Relatedly, the Supreme Court has recognized that "past experience" should guide the analysis: a statutory scheme is severely burdensome if minor party and independent candidates "only rarely … succeed in getting on the ballot," whereas the reverse is true if they "have qualified with some regularity." *Storer v. Brown*, 415 U.S. 724, 742 (1974). Plaintiffs submitted evidence sufficient to demonstrate a severe burden under these tests, but once again the Order merely acknowledges that Plaintiffs submitted such evidence but fails to address it. Here, the Order states that Plaintiffs argue for a severe burden "based on the infrequency of minor party candidates appearing on the ballot in New Mexico." Order at 26. In fact, Plaintiffs argue that:

> [E]vidence in the public record—*i.e.*, New Mexico's official elections results—confirms that the challenged provisions operate to freeze the political status quo. Although minor parties may become "qualified" pursuant to § 1-7-2(A), they rarely place their nominees on New Mexico's general election ballot. Independent candidates also rarely qualify. In almost every race for U.S. House and U.S. Senate from 2002 – 2024, just two candidates qualified for the ballot. Winger Decl. ¶ 23. That is also true of New Mexico's elections for statewide state offices in the same period—just two candidates qualified for the ballot. Winger Decl. ¶ 24. Indeed, in every election for state and federal office (except President)[2] since 2000, New Mexico has never had more than three candidates on the ballot. Compl. ¶ 55 (citing official election results); Winger Decl. ¶ 23. Even fewer candidates appear on the ballot for state legislature. In a *majority* of state legislative races in almost every election cycle for the last two decades, a single candidate appeared on the ballot running unopposed, Compl. ¶¶ 58-72, and not one of those races had more than three candidates on the ballot. Compl. ¶ 73; *see generally* New Mexico Secretary of State, Election Results, *available at* https://www.sos.nm.gov/voting-and-elections/election-results/ (accessed July 26, 2026).

> [2]Presidential elections are an exception because New Mexico imposes no petition requirement on minor party nominees for President and Vice President. See § 1-15-3. Even so, New Mexico has never had an overcrowded ballot in presidential elections for the last 24 years. Compl. ¶¶ 56-57.

Pl. Mot. for Prel. Inj. at 12, ECF No. 8.

This evidence is also uncontested and cannot be genuinely disputed because it is based on public records. Furthermore, it does not merely establish the "infrequency" with which minor party and independent candidates appear on New Mexico's general election ballot: it proves that they almost never do. If such evidence is insufficient to demonstrate a frozen status quo under *Jenness* or to satisfy the "past experience" test under *Storer*, it is difficult to imagine what could.

The Order's rationale for finding Plaintiffs' evidence insufficient is even less convincing here. First, the Order asserts that Plaintiffs' "status quo argument is not coherent" because NMFP's candidates have not run for office prior to 2026, and therefore "[w]hether NMFP candidates appear frequently or infrequently is not ascertainable." Order at 26. This, too, is clear error: the frozen status quo test under *Jenness* and the past experience test under *Storer* do not ask whether a particular minor party or independent candidate has successfully qualified for the ballot with any regularity, but rather whether *any* such party or candidate has. *See Jenness*, 403 U.S. at 438-39; *Storer*, 415 U.S. at 742. To suggest that application of such a test is "not coherent" in the case of a newly-formed political party is simply wrong.

The Order next asserts that Plaintiffs' citation to *Jenness* is "inapposite" because New Mexico's statutory scheme is distinguishable from the Ohio statutory scheme discussed in *Jenness*, which had been found to freeze the status quo. Order at 27. But Plaintiffs cite to *Jenness* only for the test it announces, which is still good law. That New Mexico's statutory scheme differs from the Ohio scheme discussed in *Jenness* has no bearing on whether the New Mexico scheme operates to freeze the political status quo. Plaintiffs' evidence establishes that it does.

In spite of that evidence, which the Order does not address, the Order concludes that "reasonably diligent candidates can access the ballot and therefore the regulatory scheme does not freeze the status quo." Order at 27 (citing *Storer*, 415 U.S. at 742). The only evidence cited in support of this conclusion is that "Plaintiffs' *local* candidates qualified" in 2026, Order at 27 (emphasis added), but that fact says nothing about Plaintiffs' claim that the 10 petitions and 131,361 signatures New Mexico requires of Plaintiffs to qualify their candidates for *statewide* office is severely burdensome. To qualify for the general election ballot, Kava needed only 59 signatures; Montoya 928; and Dinge 1,014. By contrast, as candidates for statewide office, Perls and Vigil each needed 14,200—14 to 240 times more than the local candidates—within the same petitioning period and without the online platform for most of it. Whether three local candidates could gather a few hundred signatures in a county or district says nothing about whether candidates for statewide office could gather 14,200 apiece, much less whether a newly qualified minor party can be required, consistent with the Constitution, to submit 10 separate petitions with 131,361 signatures to run a full slate of statewide candidates. Plaintiffs' evidence shows that it cannot. Contrary to the Order's assertion, nothing in the record—including evidence pertaining to Plaintiffs' local candidates—contradicts that conclusion.

Based on the foregoing, the uncontested record establishes a severe burden on Plaintiffs' rights. The Order repeatedly cites to *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1310 (10th Cir. 2007), but that case is not to the contrary. *Herrera* faulted the Libertarian Party for offering no testimony from candidates who actually attempted to gather signatures. Order at 18 (quoting *Herrera*, 506 F.3d at 1310). Perls and Vigil attempted, spent $63,000, reached half a million voters, and fell short. Order at 10–11. That is precisely the evidence *Herrera* found missing, and the Order's conclusion that Plaintiffs' showing "is not the type of evidence listed in

*Herrera*," *id.* at 18, cannot be squared with *Herrera*'s own description of the evidence lacking there. Courts routinely treat comparable evidence—the cost of compliance, the near-total absence of successful minor-party candidacies, and requirements exceeding other states'—as marks of a severe burden. *See Graveline v. Benson*, 992 F.3d 524, 539–40 (6th Cir. 2021); *Lee v. Keith*, 463 F.3d 763, 766, 768–69 (7th Cir. 2006); *Williams v. Rhodes*, 393 U.S. 23, 47 & n.10 (1968) (Harlan, J., concurring). Indeed, Pennsylvania's ballot access scheme was held unconstitutional as applied to minor party candidates on a similar record, because compliance demanded a substantial investment of time and resources during the campaign season, no alternative route to the ballot existed, and minor party candidates would always need more signatures than major-party candidates. *See Constitution Party of Pa. v. Cortes*, 116 F. Supp. 3d 486, 501-05 (E.D. Pa. 2015), *aff'd*, 824 F.3d 386 (3rd Cir. 2016). Each of those features is present here.

Plaintiffs have established a severe burden on their First and Fourteenth Amendment rights based on every test the Supreme Court has recognized. Whether measured in comparison to other states, by the stifling impact they have had on minor party candidacies, or the cost of complying with them, the record evidence shows that the burdens imposed by New Mexico's ballot access requirements fall on the "severe" end of the scale. The Order concludes otherwise only because it misstates the nature and magnitude of the burden and disregards the facts and evidence establishing it as severe. The Order should be stayed.

### B. The Severe Burden Imposed By New Mexico's Excessive Signature Requirements Is Compounded By the 41-day Petitioning Period and the Voter Registration Freeze.

When a plaintiff challenges ballot access provisions in combination, as Plaintiffs do here, the court must weigh their combined effect rather than measure each statute in isolation. *See Utah Republican Party v. Cox*, 892 F.3d 1066, 1088 (10th Cir. 2018); *Graveline*, 992 F.3d at 536

(citation omitted). The Order did the opposite. Not only did it evaluate the 14,200-signature requirement imposed on a single statewide candidate in isolation from every other signature requirement Plaintiffs were required to meet, but also, it treated the other provisions that Plaintiffs challenge—including the 41-day petitioning period, the voter registration freeze, and the doubled 2% signature requirement for "small" minor parties—as though the others did not exist, and it then confirmed the result by pointing to three local candidates who faced none of those burdens at scale. But just as the Order was obligated to assess the burden imposed by New Mexico's signature requirements based on the actual number of signatures Plaintiffs were required to submit, so too was it obligated to assess that burden in combination with the truncated petitioning period and the voter registration freeze New Mexico imposed, which made its online petitioning platform unavailable for most of Plaintiffs' petitioning period.

The Order held that NMFP's "forty-one day window to gather signatures was self-imposed" because "[n]othing prevented NMFP from forming prior to the availability of the petition forms." Order at 17 (citing *Libertarian Party of N.M. v. Vigil-Giron*, 2006 WL 8443845, at *10 (D.N.M. Sept. 18, 2006)). But this Court has previously rejected this same reasoning. *See Constitution Party of New Mexico v. Duran*, No. 1:12-cv-325 (Dec. 9, 2013) (order granting summary judgment to minor party plaintiff). In holding that New Mexico's previous April deadline for minor parties to become ballot-qualified violated the minor party Plaintiff's First and Fourteenth Amendment rights, the Court expressly rejected "Defendant's argument that if Plaintiff starts collecting signatures earlier in the year, the April deadline must not be burdensome to minor parties like Plaintiff." *Id.* Here, as in *Constitution Party of New Mexico*, the Legislature was responsible for establishing the party-petition deadline, which it set at the twenty-third day after the primary—the same day the nominees' petitions are due. §§ 1-7-2(A), 1-7-4(A), 1-8-2(B); Mot.

at 5, ECF No. 8. NMFP filed 48 days early. Order at 10. A party that beats the statutory deadline by seven weeks has not "imposed" anything on itself; it has used the time the State allotted. Holding that a party must ignore the Legislature's deadline and form the year before, on pain of forfeiting its nominees' ballot access, converts the statutory schedule into a trap and is not a burden analysis at all.

The freeze on voter registration compounds the error. The Order attributed the closure of the online platform to "NMFP's timing," Order at 10, yet the freeze is imposed by statute, §§ 1-4-8(A), (B), (D), and § 1-8-2(E) separately required NMFP's nominees to be registered members no later than the day the party filed its petition. Order at 2. The State thus (i) required candidates to change registration by May 8, (ii) refused to process registration changes from May 5 to June 8, and (iii) conditioned online petitioning on completed registration. Whatever label is attached—"deactivation" or "statutory pause"—the cause is state law and the effect on the as-applied burden is identical: the platform on which Plaintiffs' $44,500 outreach campaign depended was unavailable for the majority of the petitioning period. *Anderson* directs courts to weigh "the character and magnitude of the asserted injury," 460 U.S. at 789, not to ask whether the State acted by affirmative deactivation or by neutral operation of its own code. Where a State's own measures impede signature gathering during the petitioning period, courts treat the resulting shortfall as the State's burden to justify and reduce the requirement accordingly. *See Garbett v. Herbert*, 458 F. Supp. 3d 1328, 1352 (D. Utah 2020) (enjoining full enforcement of Utah's signature requirement where the State's emergency orders restricted signature gathering, and finding the balance of harms favored a reduced requirement); *see also Libertarian Party of Il. v. Pritzker*, 455 F. Supp. 3d 738, 745 (N.D. Ill. 2020) (granting similar relief as set forth in parties' agreed-upon order). The decisions upholding New Mexico's and other States' signature requirements involved candidates

who had the full statutory period with circulation unimpeded. *See*, *e.g.*, *Parker v. Duran*, 180 F. Supp. 3d 851, 858 (upholding the independent-candidate requirement where New Mexico imposed no suffocating restrictions on the circulation of petitions and the deadline fell 23 days after the primary). Plaintiffs are unaware of any case involving a State that closed its own petitioning channel to the candidate for most of the petitioning period.

*Vigil-Giron* does not carry the weight the Order placed on it. Order at 17. That decision addressed a party that had not attempted to gather candidate signatures and rested on the absence of any evidence of burden, *see Herrera*, 506 F.3d at 1310; it did not hold that a party which meets the statutory deadline forfeits its right to challenge the petitioning period the statute creates. The Order also overlooks that the Election Code guarantees the compressed window for every newly qualifying party that uses the statutory schedule, because certification necessarily follows petition filing and the candidate deadline follows twenty-three days after the primary. Reply at 5, ECF No. 14. A burden the scheme produces by design is a burden the State imposes. Here, the uncontested evidence establishes that New Mexico's truncated petitioning period significantly increased the burden imposed on Plaintiffs. Perls Decl. ¶¶ 13-16, ECF No. 8-3; Vigil Decl. ¶¶ 7-12, ECF No. 8-2; Montoya Decl. ¶¶ 6-7; Kava Decl. ¶ 7, ECF No. 8-5; Dinge Decl. ¶¶ 7-13, ECF No. 8-6.

Finally, the limited period New Mexico allows for minor party nominees to circulate their petitions imposes unequal burdens on them because New Mexico allows major party candidates a significantly longer petitioning period despite their substantially lower signature requirements. Pl. Mot. for Prel. Inj. at 18-19, ECF No. 8. The Order denies that New Mexico grants major party candidates "preferential treatment" but fails to address this unequal burden. Order at 21.

**C. The Order Errs By Uncritically Accepting Generic State Interests as Justification for the Severe Burdens New Mexico's Statutory Scheme Imposes.**

The second step of the *Anderson/Burdick* analysis requires the court to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789. The Order repeatedly fails to do so. For instance, the Order finds that New Mexico's signature requirements serve the "important interest in requiring candidates demonstrate support," Order at 19, but provides no analysis of how or why New Mexico is justified in requiring more signatures, by far, than any other state in the nation when the uncontested evidence unequivocally establishes that New Mexico's requirements are more restrictive than necessary to further its legitimate regulatory interests. Winger Decl. ¶¶ 9-14, 21, 23-25, ECF No. 8-1. In fact, the Order provides no analysis whatsoever.

Similarly, the Order fails to identify any state interest that could justify New Mexico allowing major party candidates a longer petitioning period than it allows minor party candidates, when major party candidates need only a fraction of the signatures that minor party candidates must obtain. Pl. Mot. for Prel. Inj. at 18-19.

The Order also excuses the Secretary's failure to proffer any justification for "the increased requirement for signatures based on the number of minor party members"—that is, for New Mexico's arbitrary and punitive requirement that minor parties with relatively few members must obtain twice the number of signatures required of larger minor parties—"other than the state interest in regulating elections." Order at 24; *see* Pl. Mot. for Prel. Inj. at 3-4, 15, ECF No. 8. Rather than hold the Secretary to its burden under the *Anderson/Burdick* framework, the Order supplied the missing justification, reasoning that a larger minor party "has more demonstrated support," so its candidates should face a lower hurdle. Order at 24. A generalized interest in "regulating elections" is not a "precise interest," and a court may not sustain a severe burden based

on "generalized and hypothetical interests identified in other cases." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 593 (6th Cir. 2006); *see Anderson*, 460 U.S. at 793. This District has itself invalidated a New Mexico petition deadline where the State presented no factual basis for it. *See Constitution Party of N.M. v. Duran*, *supra*.

The doubled signature requirement for smaller minor parties also fails on its own terms. NMFP had just demonstrated statewide support with 3,561 valid signatures; the State then demanded that each nominee show four times that support again, within 41 days, because the party was new. *Vigil-Giron* upheld New Mexico's two-petition system on the reasoning that the candidate petition adds meaningfully to the party petition. 2006 WL 8443845, at *11. It did not address, and the Order does not explain, why newness alone justifies doubling that addition. Where the State can serve any interest in a "modicum of support" through the 1% requirement it applies to other minor parties, the 2% requirement is not narrowly tailored. *See Norman v. Reed*, 502 U.S. 279, 289 (1992). This District reached that conclusion in *Workers World Party v. Vigil-Giron*, 693 F. Supp. 989, 995-96 (D.N.M. 1988), enjoining a New Mexico minor-party petition condition because the State's interest in an initial showing of support was already served by the base signature requirement, and the added condition merely imposed a further burden that unduly restricted association. The same logic governs a requirement that doubles for no reason other than the party's date of qualification: whatever interest the 1% requirement serves, doubling it serves only to exclude. "The State's interests must be *proportionate* to the burden the election procedures impose on Plaintiffs, and the specific State interests must *necessitate* the particular burden caused by the election procedures." *United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1253 (D. Utah 2017). A facially valid requirement is still invalid as applied to candidates if it impacts them unequally. *See Patriot Party of Pa. v. Mitchell*, 826 F. Supp. 926, 939-41 (E.D. Pa. 1993) (2% signature

requirement facially valid but unconstitutional as applied to candidates whose elections would always follow higher-turnout elections and thus always demand more signatures). A party entitled to the ballot is entitled to it on the day it qualifies, and a requirement whose only trigger is that a party is too new to have grown its rolls "operate[s] to freeze the political status quo." *Jenness*, 403 U.S. at 438.

### D. The Order Errs By Equating the Severe Burdens Imposed on Plaintiffs With the Minimal Burdens Imposed on Major Party Candidates.

The Order found the two schemes "reasonably similar" because major-party candidates must win a primary and, to reach the primary ballot, must either receive 20% of a convention vote or submit signatures. Order at 21–23 (citing §§ 1-8-21.1(C), 1-8-33(B)). The record shows the disparity. A major party statewide candidate reaches the primary ballot with 2,505 or 2,351 signatures, or with none at all through the convention, and then reaches the general election ballot automatically. Mot. at 6, 17, ECF No. 8. Perls and Vigil each exceeded the major party signature threshold and still needed roughly five to six times more. That is the disparity *Maryland Green Party v. Maryland Board of Elections*, 832 A.2d 214, 232–33 (Md. 2003), condemned: a major party nominee shows no personal modicum of support because the party's prior support suffices, while the minor party nominee must petition on top of the party's petition. The Order distinguished *Maryland Green Party* on the ground that New Mexico's major party candidates "must show support," Order at 23, but a 20% convention vote among party delegates is not a showing of voter support comparable to 14,200 registered voters, and the Order did not weigh the two.

### E. The Order Erred in Concluding That Plaintiffs' Challenge to § 1-8-2(E) Is Moot and That Plaintiffs Lack Standing to Assert It.

Kava was placed on the ballot only after the Secretary elected, without statutory authority, to extend to her the treatment given Montoya. Order at 4; Resp. at 2 n.1, ECF No. 13. Contrary to

the Order's conclusion, Order at 13, that voluntary accommodation does not moot Plaintiffs' challenge to § 1-8-2(E) or deprive them of standing to assert it.

As to standing: the Supreme Court has consistently held that "the court must determine whether standing exists at the time of the filing of the complaint only." *Cleveland N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 524-26 (6th Cir. 2001) (collecting cases). Plaintiffs plainly had standing to challenge § 1-8-2(E) when they filed their Complaint because Defendant DeLaney's enforcement of that provision barred Kava from the ballot. Even the Order concedes that much—it asserts only that Defendant DeLaney's voluntary cessation of enforcement "*deprives* Plaintiff Kava of standing…." Order at 13 (emphasis added). But the Order is incorrect. All Plaintiffs had standing to challenge § 1-8-2(E) when they filed their Complaint and Supreme Court precedent makes clear that is all they were required to establish. *See Cleveland N.A.A.C.P.*, 263 F.3d at 524-26.

The Order is also incorrect as to mootness. This Court, like every other federal court, has consistently recognized two exceptions to the mootness doctrine: one involves disputes that are "capable of repetition yet evading review," and the second involves the "voluntary cessation of the defendant's conduct." *AerSALE, Inc. v. City of Roswell*, No. 2:22-cv-00218 (June 11, 2024) (Strickland, J.) (citing *Brown v. Buhman*, 822 F.3d 1151, 1166 (10th Cir. 2016)). Disputes that are not moot because they are capable of repetition but evading review are those where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Brown*, 822 F.3d at 1166 (quoting *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007)). This case fits squarely within that exception: Plaintiffs will not be able to litigate their claims to a final judgment before passage of the 2026 general election, and the

controversy is reasonably likely to recur. *See*, *e.g.*, *City of Herriman v. Bell*, 590 F. 3d 1176, 1181-82 (10th Cir. 2010). Indeed, election law cases such as this are the paradigmatic example of controversies that are not mooted because they are capable of repetition yet evading review. *See Rio Grande Foundation v. Oliver*, 57 F.4th 1147, 1166 (10th Cir. 2023) (citing *Wis. Right to Life, Inc.*, 551 U.S. at 462).

Nor does Defendant DeLaney's voluntary cessation of enforcement of § 1-8-2(E) moot Plaintiffs' challenge to that provision. "Voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Brown*, 822 F.3d at 1166 (quoting *Know v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). "This rule is designed to prevent gamesmanship. If voluntary cessation automatically mooted a case, `a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.'" *Id.* (quoting *Already*, 568 U.S. at 91). Consequently, a defendant's voluntary cessation of challenged conduct will not moot a claim unless "the defendant carries 'the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* Defendants cannot carry that burden here. Section 1-8-2(E) remains law, and far from disavowing any intention to enforce it, Defendant DeLaney has a statutory obligation to do so. A challenge answered by a defendant's discretionary, unilateral accommodation—while the statute remains on the books—is not mooted by such voluntary cessation.

**IV. Exclusion From the Ballot Is Irreparable Harm Independent of the Merits Ruling.**

The Order found no irreparable harm for one reason: Perls and Vigil "are unlikely to succeed on the merits." Order at 28. That collapses two factors into one. In the Tenth Circuit, "[t]he

loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury," and when a constitutional deprivation is alleged, "no further showing of irreparable injury is necessary." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The Tenth Circuit applied that rule to reverse the denial of a preliminary injunction in *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1263-64 (10th Cir. 2016), holding that the likelihood of a First Amendment violation, standing alone, established irreparable injury. Courts deciding ballot-access cases apply the same rule. *See Garbett*, 458 F. Supp. 3d 1328, 1349-50 (loss of First Amendment freedoms for even minimal periods is irreparable injury supporting a preliminary injunction). Indeed, contrary to the Order's conclusion, this Court recognizes that exclusion from a ballot constitutes irreparable injury to both the candidate and the voters who would support him, even where the plaintiffs failed to establish a substantial likelihood that they would prevail on the merits. *See Logan*, 163 F. Supp. 3d at 1031.

## V. The Balance of Harms and the Public Interest Favor Placing Two Qualified-Party Nominees Who Have Demonstrated a Substantial Modicum of Support on the Ballot.

The Order's balancing "rests on alleged constitutional violations" that the Court "has not found," Order at 30, and so adds nothing to its merits ruling. Weighed independently, the equities favor Plaintiffs. Placing two names on a ballot imposes a negligible administrative burden; the Secretary already added Kava after the motion was filed. Order at 4. The State "does not have an interest in enforcing a law that is likely constitutionally infirm," and "the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010); *see Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir. 2012) ("it is always in the public interest to prevent the violation of a party's constitutional rights"); *Fish*, 840 F.3d at 754–56. Federal courts in this Circuit have found the balance favors ordering election officials to certify a candidate for the ballot. *Goodall v.*

*Williams*, 324 F. Supp. 3d 1184, 1200 (D. Colo. 2018) (threatened injury to the candidate outweighed any harm from an injunction requiring the Secretary of State to certify him, and the injunction was not adverse to the public interest); *Garbett*, 458 F. Supp. 3d at 1351 (balance favored injunction where the State articulated no harm beyond assertions the court had already rejected).

The public-interest calculus is unusual here and cuts one way. The Republican Party fielded only a write-in candidate for U.S. Senate and no candidate for State Auditor. Mot. at 23–24, ECF No. 8. New Mexico voters in those races will otherwise choose from a single printed name. Adding a nominee of a qualified party who has already exceeded the major-party signature threshold serves the State's own stated interest in a ballot "listing serious candidates with some prospects of public support," Order at 29 (citing *Lubin v. Panish*, 415 U.S. 709, 715 (1974)); it does not clutter the ballot. The public interest favors an injunction placing a party's nominee on the ballot precisely because it gives voters another option, and withholding it denies voters an important choice. *United Utah Party*, 268 F. Supp. 3d at 1260-61 (enjoining Utah's Lieutenant Governor from omitting a party's nominee from the ballot).

The Order's remaining concern—that other 2026 minor-party candidates might cite the relief, and that the State "would be hard pressed to prevent future minor party candidates from appearing on the ballot," Order at 30–31—contradicts the Order's own framing. The Court expressly limited its analysis to Plaintiffs and "expresse[d] no opinion" about other parties or candidates. *Id.* at 8 (citing *United States v. Carel*, 668 F.3d 1211, 1218 (10th Cir. 2011)). An as-applied injunction tailored to the 41-day window, the registration freeze, and these two candidates binds no one else, and *Abbott v. Perez*, 585 U.S. 579, 602 (2018), protects a State's interest in enforcing its statutes only "unless unconstitutional." Order at 29–30. In *Goodall*, the Secretary of

State's inability to identify any other candidate who would have qualified but for the challenged provision weighed in favor of relief. 324 F. Supp. 3d at 1200. The Secretary has identified no other 2026 candidate who was certified during the registration freeze, faced a 41-day window, and petitioned at the doubled rate.

**VI. The Requested Relief and the Need For an Expedited Ruling.**

Plaintiffs request that the Court (a) stay the Order pending appeal; (b) enjoin Defendants, pending appeal, from enforcing § 1-8-2(B) against Perls and Vigil and direct the Secretary to certify and print them on the November 3, 2026 general election ballot as NMFP's nominees for U.S. Senate and State Auditor; and (c) in the alternative, enjoin Defendants from certifying or printing general election ballots that omit Perls and Vigil until the Tenth Circuit rules on Plaintiffs' Rule 8 motion. Consistent with Rule 62(d), Plaintiffs ask that no bond be required; the relief imposes no monetary cost on Defendants.

Federal law requires the State to transmit absentee ballots to military and overseas voters no later than 45 days before the election, which falls on September 19, 2026. 52 U.S.C. § 20302(a)(8)(A). Plaintiffs therefore request a ruling on this motion as soon as practicable, and reserve their right to seek relief from the Tenth Circuit pursuant to Fed. R. App. P. 8(a)(2).

Plaintiffs further request that the Court stay further proceedings on the merits during the pendency of the interlocutory appeal, or of any application to the Supreme Court of the United States, to avoid duplicative litigation while the Tenth Circuit addresses the governing standard.

WHEREFORE, Plaintiffs respectfully request that the Court enter an order staying its Order Denying Motion for Preliminary Injunction, ECF No. 22, pending appeal; enjoining Defendants pending appeal from enforcing § 1-8-2(B) against Plaintiffs Perls and Vigil and directing the Secretary of State to place them on the November 3, 2026 general election ballot as

the New Mexico Forward Party's nominees for U.S. Senate and State Auditor; alternatively, enjoining Defendants from certifying or printing ballots omitting them until the Tenth Circuit rules; ruling on this motion as soon as practicable; and granting such further relief as the Court deems just.

Respectfully submitted,

*/s/Oliver B. Hall*
Oliver B. Hall (pro hac vice)
D.C. Bar No. 976463
CENTER FOR COMPETITIVE DEMOCRACY
P.O. Box 21090
Washington, DC 20009
(202) 248-9294
oliverhall@competitivedemocracy.org

WESTERN AGRICULTURE,
RESOURCE AND BUSINESS
ADVOCATES, LLP

A. Blair Dunn, Esq.
Jared R. Vander Dussen, Esq.
400 Gold Ave. SW, Suite 1000
Albuquerque, NM 87102
Telephone: (505) 750-3060
Facsimile: (505) 226-8500
abdunn@ablairdunn-esq.com
warba.llp.Jared@gmail.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 4, 2026, a true and correct copy of the foregoing was filed electronically pursuant to the CM/ECF procedure for the District of New Mexico and caused counsel of record to be served by electronic means.

*/s/Oliver B. Hall*
Oliver B. Hall